PIERREZ (MARSHALL v.). See Case No. 9,-130.

## Case No. 11,153.

### In re PIERSON.

[10 N. B. R. 107.] [1]

### District Court, D. Delaware. 1874.

BANKRUPTCY—WHEN ASSIGNMENT TAKES EFFECT—REGISTER'S MISTAKE—FAILURE OF ASSIGNEE TO RECORD DEED — DISCHARGE — PREFERENCES — PARTNERSHIP — INTENTION— SALARY MEASURED BY PROFITS.

1. The assignment of the bankrupt's property will, by operation of law, relate to the commencement of proceedings in bankruptcy, uncontrolled by any mistake in the register in stating the time from which the deed should operate.

[Cited in brief in Re Watson, Case No. 17,273; Re Watson, Id. 17,275.]

2. When an assignee has formally accepted his appointment as assignee, and given bonds, his neglect to take into his own custody the deed of assignment and have the same recorded, when he knew that no property passed by the assignment, is no ground for withholding a discharge.

[Cited in Re Carrier, 47 Fed. 440.]

3. Only those preferences which are forbidden and made void by the 35th section of the bankrupt act [of 1867 (14 Stat. 534)], and the clause of the 29th section which refers to preferences in contemplation of becoming bankrupt, are considered grounds for withholding the bankrupt's discharge.

[Cited in Re Lowenstein, Case No. 8,573; Re Wolfskill, Id. 17,930; Re Carrier, 47 Fed. 444.]

[1] [Reprinted by permission.]

4. No partnership inter sese can exist unless with the intention of the parties.

5. An agreement to give and take a salary, to be measured by the net profits received, does not create a partnership—the distinction stated between a salary measured by the profits, and a share of the profits as such.

6. A transfer of property, made at or about the time of advances, and in payment therefor, will not subject the debtor to proceedings in involuntary bankruptcy; but if made some time before the advances, it is a preference which will subject him to such proceedings.

7. A preference may be given which will subject the debtor to proceedings in involuntary bankruptcy, and yet be no bar to his discharge.

Opinion and decision upon the hearing of the specifications filed by John A. Harris and Isaac L. Devou, certain creditors of the bankrupt [William H. Pierson] against his discharge.

S. M. Harrington and W. Cummins, for creditors.

B. Fields, for bankrupt.

BRADFORD, District Judge. The first specification is as follows, viz.: "That the said bankrupt has willfully sworn falsely in his affidavit annexed to his petition, schedule, and inventory, in relation to material facts concerning his estate and debts, in this—That he willfully and fraudulently omitted the name of the said Isaac L. Devou, a creditor, from his schedule of debts filed in this cause. In that he has willfully and fraudulently stated in his schedule of debts filed in this cause, that the debt of John A. Harris & Son was contracted prior to the 1st day of January, A. D. 1869, that is, in the year 1868, when in truth and in fact, the said debt was contracted with John A. Harris in his individual capacity subsequent to the 1st day of January, A. D. 1869." Upon the argument of the first part of this specification, the court, while giving attention to a long argument in behalf of the petitioning creditors, declined hearing the counsel for the bankrupt. The court then saw no ground whatever to suppose that any willful or fraudulent omission had been made by the bankrupt; and it remains of the same opinion now, although a contrary view has been zealously maintained by the counsel for the opposing creditors.

First. While it is evident now, after all we have heard of the testimony (and might have been ascertained by the bankrupt had there been any motive to inquire particularly), that Isaac L. Devou had the beneficial or equitable interest in the sum of money paid to the firm of Joseph D. Pierson & Brother out of the funds in possession of James L. Devou, and on his own individual check, it is not, under all the circumstances, at all surprising that the bankrupt should have really supposed James L. Devou was the owner of the claim. His active and sole management of the loan; his appearance to represent the claim among the creditors; the undenied representation of one of

the counsel for the opposing creditors, to whom he applied for his legal services for the purpose of obtaining the benefit of the bankrupt act, that the release of Mr. James L. Devou of his claim was first necessary; together with many other circumstances, might, the court thinks, mislead the mind of the bankrupt as to the real ownership of the claim. Besides, an idea by the bankrupt that Isaac L. Devou had a beneficial or equitable interest in the money loaned and secured by the notes afterwards given by the firm (the bankrupt having had no part in the finances or money arrangements of the firm), was not absolutely inconsistent with the idea that James L. Devou was the legal owner of the claim, and could maintain suit for it. Nor was the employment of Isaac by the firm inconsistent with this idea, for, being the brother of James, he might have been employed by the firm as a favor to the one who was supposed to be the influential (and indeed, was the influential) one who had effected the loan.

Second. He filed the name of James L. Devou for the amount of about the principal of the notes; the difference ·between the amount of the first proven claim and the amended claim, being the interest on the notes, which was compounded with the principal at the time of obtaining judgment. He did not omit the debt, he may have made a mistake in the name of the creditor. It is not pretended that he did not return James as a creditor for the amount of the principal of the notes, and it is not pretended that the debt afterwards returned as that of Isaac, was not the same debt reduced to judgment. Leaving out the difference of amount (the mistake in which is easily accounted for), where was the wrong done? where was the deception? where the fraud? It was altogether to the interest of the bankrupt to return every creditor in his schedule; an omission would have deprived him of the benefit of the bankrupt act, as far as the omitted creditor was concerned. And as James L. Devou was the persistent creditor refusing his assent to the discharge, the argument is irresistible, that he especially wished a discharge from that debt; and as he could be discharged from that debt only by returning the name of the real creditor, it is to be presumed he returned the name of the one he thought was the real creditor.

Third. While a creditor who has not been returned at all on the schedule of the bankrupt, original or amended, as such creditor, may, especially if there have been assets (his share of which he may have been deprived of by want of notice), object to discharge by reason of willful and fraudulent omission. Can a creditor, when there are no assets, whose name has been put on an amended schedule, object to discharge for such former omission which has been subsequently remedied? This question may be

raised, though the point is decided on the explicit ground that there is no evidence whatever of a fraudulent or willful omission. The second branch of the first specification is in these words, viz.: "That he has willfully and fraudulently stated * * *." From all the evidence in this cause the court cannot arrive at the conclusion that there was any fraud or intended wrong in the return of the debt of John A. Harris, contracted January 1, 1869, as the debt of Harris & Son, contracted in 1868. The circumstances under which the debt was contracted and the situation of the bankrupt in the firm of Joseph D. Pierson & Brother sufficiently account for what the court thinks an innocent mistake. The first specification is therefore overruled.

The second specification is as follows, viz.: "That although all of the debts named in the said bankrupt's schedule are stated to be the debts contracted with the firm of Joseph D. Pierson & Brother, yet the petitioner does not, either in his original petition to be adjudicated a bankrupt, or in his petition for a discharge, ask to be adjudicated a bankrupt with reference to, or to be discharged from, the partnership debts of the firm of Joseph D. Pierson & Brother." We know of no provision of law which requires a petition to pray for discharge from partnership debts in precise words. He does pray to be discharged from all his debts provable under the bankrupt law, and therefore he does virtually pray for discharge from partnership debts, as they, as well as individual debts, are provable under the bankrupt law. The second specification is overruled.

The third specification is as follows, viz.: "That the said bankrupt, being a tradesman, has not, subsequently to the passage of the act, entitled, 'An act to establish a uniform system of bankruptcy throughout the United States,' approved March 2, 1867, kept proper or intelligible books of account of his business." It will be remembered that the bankrupt files his individual petition to be discharged from all debts provable under the bankrupt act; that the firm of Joseph D. Pierson & Brother was dissolved on the 6th day of August, 1869, by the death of Joseph D. Pierson, and that William H. Pierson has been seeking a support by his own personal labor from that day to the day of filing his petition in bankruptcy, viz., the 12th day of July, 1872. Inasmuch as the books of the firm were produced at the hearing, it may fairly be presumed that the return of "none" in his schedule was, in the bankrupt's mind, referable to books showing his individual business at the time of filing his petition, and not partnership business. Be that as it may, however, the court does not consider that an omission or mere oversight in reference to returning the books of business, which were thought by the bankrupt as of no possible benefit or use to any

creditor, in itself a ground for refusing a discharge, especially when that omission is cured by their voluntary production in court afterwards.

The act of congress requires that every merchant and tradesman, subsequently to the passage of the bankrupt act, should keep proper books of account, and forbids a discharge if such books are not kept. A surviving partner seeking a discharge from partnership debts is as much bound to show that his firm has conformed to the provisions of the act, as if the firm, as a firm, were applying for discharge. The rights of the creditors to all the aid for discovery from these books is the same in either case. It matters not that William H. Pierson was a junior member of the firm, not the keeper of the books, he is seeking a discharge from partnership debts, and must be bound by the obligations imposed by law on the partnership. If Joseph D. Pierson & Brother did not keep proper books of account, that fact stands as a bar to the discharge of William H. Pierson. Did Joseph D. Pierson & Brother keep such books as are required by the act of congress?

Certain books of account have been produced at the hearing, purporting to be the books of account of Joseph D. Pierson & Brother; some of them are in a mutilated condition, a condition which demands an explanation not yet given. They consist of four books, two day-books and two ledgers; the first day-book and corresponding ledger embracing entries from March 1st, 1867, to June 30th, 1868; the second day-book and corresponding ledger from the latter date to the date of the dissolution of the partnership, viz., on the date of the death of Joseph D. Pierson, on the 6th of August, 1869. These two day-books are daily memoranda of debits for work done, goods sold, etc., credits for moneys paid the firm, and are transferred to the ledger in all cases with more than ordinary accuracy, except where the mutilation of the day-book for 1867 prevents the comparison of articles and amounts. Indeed, these entries from day-book to ledger are so uniformly correct that the inference is very strong, unless there is some suspicion of fraud in the particular accounts, that the entries in the ledgers have been correctly made of dates, sums, and items from those pages that have been mutilated, and in some cases obliterated and destroyed. One is strengthened in this view when there has been no suggestion of wrong done any creditor by falsifying books, by the fact, that upon a minute examination of the books it will be discovered in instances where the sums total in the last column have been clipped off in one strip from the side of the book, leaving the separate items not added standing, that the amounts transferred to the ledger under the precise dates, and the precise articles sold, correspond exactly with all that remained in the day-book, and the sums total in the ledger are the same as is made by the addition of items in the day-book. This view is further strengthened by the character of the mutilations; they are senseless and meaningless; they are of old accounts of the year 1867, and either closed in that year or carried into the accounts of the following year. There are no mutilations of accounts whatever from the 1st of July, 1868. In these ledgers, or books used as ledgers, were kept with care an exact expense account, showing all moneys paid out by the establishment, and a cash account, showing all moneys received for the establishment, from whatever source. Assuming that the obliterations and mutilations of the two books, viz., the day-book and ledger from the year 1867 to July 1st, 1868, were not done by the firm, or a member of the firm of Joseph D. Pierson & Brother, before the dissolution of the partnership, then, in the judgment of the court, the bankrupt has kept proper books of account.

The question now to be considered is not whether these books appear in a mutilated condition, but whether the court has, from the evidence adduced, reason to believe that the entries in the ledgers are any other than correct entries of sums, dates, items, and prices on pages of day-book mutilated and obliterated; or, has any reason to believe that the obliteration and destruction of some accounts in the latter part of the ledger ending June 30th, 1868, was a destruction and obliteration or alteration of items and accounts which were not already entered in the corresponding day-book. The books kept were not on the scale of those in larger establishments, or as numerous, yet they were proper in form—usual in form—affording an intelligible means · of knowing the condition of the partnership. These books were kept during the whole period of the partnership; and while the mutilation must be explained—because it is made by congress a separate and distinct ground of offense— a separate and distinct objection to a discharge, independent of the idea of falsifying books—yet the opposing creditors have failed to prove that Pierson & Brother did not keep proper books of account. If, after those books had been written up—finished or "kept" —the firm, after a dissolution of the partnership, for the purpose of destroying the evidence of credits, or defeating or defrauding creditors in any form, had obliterated or mutilated true entries or accounts, then they would have come under the operation of the provision for mutilating books; but it could not be said in any true sense, that they had not kept proper books of accounts. If it is argued that the books being found in this mutilated condition, it is the business of the bankrupt, in whose possession they have been, to give a satisfactory explanation of this fact, it is answered, this is true, and he must do so before he can obtain a discharge. But while this is true,

the opposing creditors have failed to show that during the partnership proper books were not kept; for they have not shown that such mutilation was made during the partnership, and I cannot assume as true that the time of the mutilation was during the partnership, when the examination of the bankrupt hereafter as to this subject of mutilation, and the examination of others, may disclose the time and all the circumstances connected with it. This specification must therefore be overruled.

The fourth specification is as follows, viz.: "That according to the schedule and inventory filed by said bankrupt in this case, he, being a tradesman, has no books, papers, deeds, or writings relating to the trade or business of the said Joseph D. Pierson & Brother." This is overruled and covered by the opinion of the court in the preceding specification.

The fifth specification is as follows, viz.: "That there are no entries, accounts, or books of any kind shown to have been kept by said firm, the members thereof being tradesmen, since the passage of said act, showing what moneys were received by said firm, or what disposition was made of the same." This is overruled and covered by the opinion given in the third specification.

The sixth specification is as follows, viz.: "No books, accounts, or papers relating to the business of the said firm, the members being tradesmen, were placed by said bankrupt in the hands or possession of his assignee." The evidence under this specification shows that nearly three years before the filing of the petition in bankruptcy, this firm of Joseph D. Pierson & Brother were in a state of hopeless insolvency; that in the fall after the death of Joseph D. Pierson every dollar's worth of property which could be reached by the most vigilant creditors was taken in execution; that the assignee had been thoroughly acquainted with the concerns of the partnership; that such book as might show the full condition of the partnership, viz., the ledger into which all the accounts of the firm had been transferred, together with the expense account and cash account, had been in the hands of the assignee, and still remained there. Any transfer of any number of books could not create assets. It was perfectly well known to the assignee that the bankrupt was insolvent by several thousands of dollars—he had examined and was familiar with the accounts of the firm—and a possession of day-books and a ledger which had become nearly obsolete by reason of its accounts having been transferred to the last ledger, would have been useless to the assignee. A neglect on the part of the bankrupt, not founded in fraud or design to injure his creditors, the court thinks could not be, in justice, a ground for objecting to the bankrupt's discharge. And in connection with these books,

let it be remembered that they were the books of a firm all of whose property had been long since exhausted by executions, and that no suggestion has been made by any creditor, that he has been damaged by any want of knowledge which the books would afford to him, or that any fraud or falsification has been ever practiced in regard to them. The sixth specification is therefore overruled.

The seventh specification is as follows, viz.: "That the assignee has not duly inquired into the assets of said bankrupt, or of said firm, nor has he had the means of so doing. Nor has said bankrupt, being a tradesman, furnished him any books or accounts to enable him to ascertain what has become of said firm's property, what were the causes of its failure, and the nature of its dealings with its creditors." The opinions given on the former specifications will cause this specification to be overruled.

The eighth specification is as follows, viz.: "That the said bankrupt has not complied with the requirements of said act, and is not, therefore, entitled to his discharge, in the following particulars: First. That he has not disclosed whether or not the firm of Joseph D. Pierson & Brother had, on the 13th day of July, A. D. 1872, when said petition was filed, any assets, real or personal property, or interest in any property of any kind, either standing in the firm's name, or held in trust for them. Second. That the schedules of said bankrupt are materially defective and incomplete, and do not comply with the requirements of the law, in that they do not show that either he or the said firm had, when said petition to be adjudicated a bankrupt was filed, any stock in trade in his or their business, or any property, real or personal, in trust for said bankrupt, or said firm, or any books, papers, deeds, or writings belonging to him or said firm, the members thereof being tradesmen, or held in trust for him or said firm."

It appears to the court that the schedules are very full, and that there is full denial of the possession of any property or interest which could be assets for the creditors. If there were assets at the time of filing the petition, they should have been stated; but the court does not perceive that he should have stated specially that he had no property belonging to the late firm of Joseph D. Pierson & Brother. Any interest as surviving partner would have been assets, and should have been mentioned in his schedules. The fact that there is no such mention, is evidence that he considered there were no such assets in existence.

To the second branch of the eighth specification it is replied that this petition was filed by an individual nearly three years after the dissolution of a partnership of which he had been a member; and that the filing in his schedule of his assets is sufficiently wide, and would embrace whatever

residuum of partnership property there may have been in his possession at the time of filing his petition. The part of this specification referring to books, papers, deeds, and writings, is already disposed of by opinions in reference to former specifications. This specification is overruled.

The ninth specification is as follows, viz.: "That at and before the time of filing said petition the said bankrupt was, as the undersigned believe, entitled to an interest in the stock in trade, goods on hand, machinery, business, debts, and other property of a certain sash and planing-mill in the city of Wilmington aforesaid, and that the same was in part held by other persons, to the undersigned unknown, in trust for him or for his benefit; and that in this particular the undersigned aver and specify that the said bankrupt has willfully and intentionally concealed a part of his estate or effects, and the books and writings relating thereto." Under this specification a prolonged and elaborate attempt was made to prove that the bankrupt was a partner with Thomas Y. De Normandie, the assignee, in the sash and planing business in this city before and at the time of filing his petition in bankruptcy; that there was a balance due from the assignee to the bankrupt at the time of filing his petition; and that he committed a fraud in not returning that balance or interest as assets.

The court thinks, on the evidence, that there was no partnership existing between the parties; that the relation was that of agent, clerk, or servant, on a salary to be measured by the net profits received on the business; that there was no idea or intention on the part of these men to create a partnership, inter sese—and without such idea or intention such a partnership cannot exist. Liability to third persons as partners may often arise from causes which will not constitute a partnership inter sese, but as between themselves the distinction is settled (however unsatisfactory it may seem) between taking money as net profits, and taking money as a salary, to be measured by the net profits received. If this view of the law be correct, there was no partnership between De Normandie and the bankrupt. Again, supposing a partnership to have existed at the time of the filing of the petition in bankruptcy, there is such an uncertainty as to any balance, or if any, as to how much was due—in the teeth of the positive declarations both of the bankrupt and the assignee that there was nothing due—as to amount to a failure on the part of the opposing creditors to show that there were any assets. This specification is therefore overruled.

The tenth specification is as follows, viz.: "That the said bankrupt has been guilty of negligence in not delivering to his assignee the property belonging to said bankrupt at the time of the presentation of his petition and inventory; in that he withheld from said assignee his interest in the business, stock, and property and machinery used in said business of planing and sash-making, and the books, accounts, and papers relating thereto; and, also, in not delivering any books, papers, or accounts in his hands at such time and belonging to the firm of Joseph D. Pierson & Brother—he, the said bankrupt, and the said firm having been, prior to filing said petition, tradesmen." As this specification relates, in part, to the subject-matter of the last specification, it has been answered by the opinion in reference to that specification; and that portion which relates to the books, papers, and accounts of Joseph D. Pierson & Brother has already been answered. This specification is overruled.

The eleventh specification is as follows, viz.: "That the said bankrupt is not entitled to his discharge, for the reason that the assets of the said bankrupt are not equal to fifty per centum of the claims proved against his estate, and contracted since the 1st day of January, A. D. 1869, upon which he is liable as principal debtor; and that the assent in writing of a majority in number and value of his creditors, to whom he has become liable as a principal debtor for debts contracted since the 1st day of January, A. D. 1869, and who have proved their claims against his estate, has not been filed in this case." The court thinks that the proper number of the proper class of creditors have filed their assent in writing to the discharge, and consequently that the bankrupt may (all other things being in due form and order) be entitled to his discharge without the payment of fifty per centum of his indebtedness. This specification is overruled.

The twelfth specification is as follows, viz.: "that the petition of said bankrupt for a discharge from his debts was not filed within one year from the adjudication of bankruptcy in this case." The record discloses the reason of the petition not having been filed within a year from the adjudication in bankruptcy, and the permission of the court to file the petition for discharge which is now before the court. The proceedings of the bankrupt in this respect are regular and proper. This specification is overruled.

The thirteenth specification is as follows, viz.: "That the proceedings in this case are irregular, defective, and illegal, in that the assignment of the property of said bankrupt relates only to the property held by the said bankrupt on the 3d day of June, A. D. 1873, when it should have related to all the property held or owned by said bankrupt, or said firm, or in trust for him or it, at the commencement of proceedings in this case, to wit, the 13th of July, A. D. 1872; and in that the assignment of the bankrupt's effects had never been delivered to the assignee; and in that the said assignment has not been

recorded as required by law." By the provisions of the act of congress, the "assignment shall relate back to the commencement of said proceedings in bankruptcy, and thereupon, by operation of law, the title to all such property and estate, both real and personal, shall vest in said assignee." This is the language of the act, and would not be controlled or modified by any inadvertence or mistake in the register in stating the time from which the deed should operate. In reference to the latter clauses of this specification, viz., that the assignee has not had possession of the deed of assignment, and that it has not been recorded, it is a sufficient answer that the assignee has formally accepted his appointment as assignee and given bond; that the assignee had neglected to take into his own custody the deed of assignment, and have the same recorded, when he well knew that nothing, in point of fact, passed by the assignment, is no ground for withholding the bankrupt's discharge. This specification must therefore be overruled.

This disposes of all the specifications filed, and I might stop here, but there were facts brought forward and matters discussed as grounds of refusing the discharge to the bankrupt, which I might refuse now to pass on under these specifications—yet as they were much relied on by the opposing creditors, I will dispose of the chief points made.

It is alleged and admitted that the bankrupt must state in his schedule of property, if he seeks discharge from partnership debts, all partnership assets which belonged to him as surviving partner at the time of filing his petition in bankruptcy. It is admitted that in February, 1869, Daniel H. Kent owed to Joseph D. Pierson & Brother about the sum of two thousand five hundred dollars, for sash furnished for a row of houses Kent was then building. That Kent, on the request of Joseph D. Pierson, made a deed of one of these houses to George W. Pierson (a brother) for the sum of two thousand five hundred dollars—the amount of the bill due Joseph D. Pierson & Brother, for which they gave their receipt to Kent as for cash paid —and the further sum of fifteen hundred dollars, or thereabouts, paid by George W. Pierson. It appears that the house was to be George W. Pierson's house, for his home. Now, it is claimed by the opposing creditors that this money was a loan by the firm to George W. Pierson; that he held the house subject to a trust to repay that amount; that the amount was not repaid, and the house not sold to Mr. Pierson till after the filing of the petition for discharge; and that therefore there were equitable assets in the hands of George W. Pierson, as trustee, at the time of filing the bankrupt's petition; and as such assets have not been mentioned in the bankrupt's schedules, he must be refused his discharge. And it is further argued, that if this was not a loan made at the time, it must have been the payment of a previous

debt under such circumstances of insolvency, or apprehended insolvency, as to make it a preference against the policy and prohibitions of the bankrupt law, and a bar to this bankrupt's discharge; of which the court will have to take notice, without any application by the parties to do so.

On considerable reflection and examination of the testimony, the court is of the opinion that this money (two thousand five hundred dollars) was transferred by arrangement of the parties concerned to George W. Pierson, in payment of debts then and before contracted; and this opinion is grounded on the explicit and unwavering statement of the bankrupt, that the transfer of this interest in the house (that is, the right to so much of the purchase-money as was represented by Kent's debt to them—two thousand five hundred dollars) was to pay an existing debt. And secondly, that the circumstances of Joseph D. Pierson & Brother were not such, that in their embarrassed situation they could loan and lay out of the use of two thousand five hundred dollars, so much needed in their business operations.

But even if it was a loan made by Pierson & Brother to George W. Pierson, what was the real nature of the transaction? Pierson & Brother loaned George W. Pierson two thousand five hundred dollars to help him purchase a house—George W. Pierson furnishing the balance of the purchase-money, viz.: fifteen hundred dollars, or thereabouts. The deed was, by request, given to George W. Pierson, Pierson & Brother taking no security for the money lent—George W. Pierson gave no mortgage, no judgment, or lien of any kind on the land. How, in any sense, was George W. Pierson a trustee of this land to pay this debt? We will assume that he owed the debt, but how was the land held in trust to pay the debt?—the house was not bought for Pierson & Brother. It is not the case of an individual taking the deed of land bought with partnership funds; it was in substance (if a loan at all) a loan by Pierson & Brother to their brother, George W. Pierson, to raise part of the purchase-money, without taking any security therefor. Suppose a firm, instead of buying for firm purposes in an individual name, loans an individual money to make up purchase-money for a house to be bought in his own name and for his own individual purposes—we ask again, how does the individual become a trustee of the land for the payment of the borrowed money? Such a thing cannot be. If this was a loan, then there could arise no such trust as is contended for. And as, by the bankrupt's testimony, all the money must have been paid by George W. Pierson to enable him to become the creditor at the time of filing the bankrupt's petition, he must have discharged his trust, as he had a right to do, if any trust ever existed. No doubt, where land is bought in whole or in part with the money of A, B taking the title as a

matter of convenience. a trust is raised in favor of A, wholly or in part, as he may have paid all or part of the purchase-money; and this is a trust of the realty, and of the proceeds of the realty, if it has been disposed of to a bona fide purchaser for valuable consideration, without notice. Such, the court thinks, cannot be the result when the intention of A's taking any interest in the corpus of the land is negatived by the understanding of the parties. This was a large sum of money; the transaction was easy of investigation; there were many creditors pressing for payment of their claims; every inquiry as to possible assets had been made, and the non-discovery of these alleged assets up to this time, is the strongest argument for their non-existence. As the court has concluded that this transfer was in payment of an existing debt at the time, all further speculations on a different hypothesis are useless.

This act was, then, the payment of an existing creditor of the firm. How far was that payment a preference which will operate as a bar to the discharge of the bankrupt? The payment was made by a firm in February, 1869; which firm was dissolved in August of the same year; the bankrupt filing his petition on July 12th, 1872. This refusal to discharge would be in the nature of punishment for a wrongful act. How far a junior partner, confessedly not the managing one of the firm, should be punished for an act over which he had little or no actual control, might present an interesting inquiry, were the court disposed to follow out that line of thought. But the case will be treated as if the act were the act alone of William H. Pierson, the bankrupt. The act certainly did constitute a preference of a creditor by persons who, it is now proven, were at the time insolvent, in the sense of not having assets sufficient to pay off their liabilities. Was this such a preference as to prevent the bankrupt's discharge?

Congress has, in the 39th section of the present bankrupt law, stated the kind of preference which a debtor will not be permitted to show to a creditor, without subjecting himself to the process of involuntary bankruptcy. If one "who, being bankrupt or insolvent, or in contemplation of bankruptcy or insolvency, shall make any payment, gift, grant, sale, conveyance, or transfer of money, or other property, estate, rights, or credits, or give any warrant to confess judgment, or procure or suffer his property to be taken on legal process, with intent to give a preference to one or more of his creditors," etc., he can, on the petition of one or more creditors, be declared a bankrupt. This was the kind of preference which congress considered inconsistent with the proper and just conduct of his own business by the bankrupt, and when it occurred gave to his creditors the privilege of taking the management of his own business into their hands by their assignee, and the more equal and equitable distribution of his assets among themselves.

Now, by the 35th section there is another class of preferences, which are not only of such a character as to subject the debtor to be declared a bankrupt, but which are absolutely void, and give the right to the assignee to recover back for the use of the general creditors, the advantage gained in fraud of the law by a combination between the debtor and the favored creditor; they are in these words, viz.: "If any person, being insolvent, or in contemplation of insolvency, within four months before the filing of the petition by or against him, with a view to give a preference to any creditor or person having a claim against him, or who is under any liability for him, procures any part of his property to be attached, sequestered, or seized on execution, or makes any payment, pledge, assignment, transfer, or conveyance of any part of his property, either directly or indirectly, absolutely or conditionally—the person receiving such payment, pledge, assignment, transfer, or conveyance, or to be benefited thereby, or by such attachment, having reasonable cause to believe such person is insolvent, and that such attachment, payment, pledge, assignment, or conveyance is made in fraud of the provisions of this act—the same shall be void, and the assignee may recover the property, or the value of it, from the person so receiving it, or so to be benefited," etc. Now, these preferences are void. The knowledge of insolvency by the creditor, and his knowledge of the intent on the part of the debtor to commit a fraud on the bankrupt act, stamp his action as of such a character as, in the judgment of congress, to make it proper not only to avoid the preference, but to forbid him from proving his claim against the estate. There is another provision or clause in the 29th section which speaks of preferences in these words, viz.: "No discharge shall be granted, or if granted, be valid, if the bankrupt * * * * has given any fraudulent preference contrary to the provisions of this act; or made any fraudulent payment, gift, transfer, conveyance, or assignment of any part of his property; or if he has, in contemplation of becoming bankrupt, made any pledge, payment, transfer, assignment, or conveyance of any part of his property, directly or indirectly, absolutely or conditionally, for the purpose of preferring any creditor or person having a claim against him," etc. Now, in this 29th section are to be found all the grounds of objection to the bankrupt's discharge, as regards preference.

The courts have given a construction to these clauses in reference to preference, and the result is, that only those preferences which are forbidden and made void by the 35th section, and the clause of the 29th section which refers to preferences in contemplation of becoming bankrupt, are considered grounds for withholding the bankrupt's discharge. The two classes of cases in the 35th section do not embrace the case before the court, for they concern preferences within

four and six months before proceedings in bankruptcy; whereas this was between two and three years before proceedings in bankruptcy. Nor does the class of cases mentioned in one of the latter clauses in the 29th section apply, for that preference must be made in contemplation of becoming bankrupt —that is, of taking proceedings in bankruptcy. And however insolvent the firm may be considered to have been at that time, there is no pretense that there was then any "contemplation" of bankruptcy.

This is the construction which has been given to the words "fraudulent preference contrary to the provisions of the act," and "fraudulent payment;" it is such preference as is declared fraudulent by the 35th section. Such preferences are a bar to the discharge, as are also the preferences in "contemplation" of becoming bankrupt, mentioned as a bar to discharge in the 29th section, and above quoted. These positions will find full authority and support in Re Locke [Case No. 8,439], where the questions are fully considered by Justice Lowell of the Massachusetts district. It will be observed that a preference may be of such a character as to subject a debtor to proceedings in involuntary bankruptcy, and not such a preference as will be a bar to his discharge; this distinction is fully recognized in the above-cited case. In Re Burgess [Id. 2,153], Justice Lowell reiterates the same principles. And in Re Freeman [Id. 5,082], Judge Blatchford (Southern district of New York) also affirms them. It appears to the court that this construction is a reasonable and proper one; and that as this case does not fall either within the classes mentioned in the 35th section as fraudulent, or the clause in the 29th section, making a preference in contemplation of bankruptcy a bar to discharge; and as, by judicial construction, it appears that these sections embrace all the valid grounds of opposition to discharge, the court is of the opinion that this preference (if illegal preference there were) constitutes no valid ground of opposition to discharge.

And lastly, was there such a preference as would have subjected the debtor to proceedings in involuntary bankruptcy? This will depend upon evidence not as yet introduced into this cause. This transfer of property was given to pay for advances—when made? If made some time before, then it was a preference which would have subjected the debtor to proceedings in bankruptcy; but if made at or about the time of the advances, and in payment therefor, then it was a perfectly proper preference, and would not subject the debtor to the proceedings aforesaid. Now, upon the point when this advance was made, the evidence is silent, except that it was made before the transfer of the property. The court will not presume in the absence of testimony that this transfer was made for a prior debt, a debt some time due, but rather that the act was a legal and proper one than an illegal and improper one. The United States

supreme court, in some late cases, have laid down the law on the subject of assistance given to struggling debtors by parties receiving security for this assistance. See Tiffany v. Lucas [15 Wall. (82 U. S.) 410]. Admitting, for the sake of argument, that the preference was such as to subject the debtor to proceedings of involuntary bankruptcy, yet the court, as before stated, does not conceive that the preference is of such a character as to be a bar to discharge in bankruptcy.

It afterwards appeared to the court, upon the testimony of witnesses, that the mutilation of the books occurred after the partnership was dissolved, and was done without the knowledge of the bankrupt, by persons who had no knowledge that the books were of any value or importance to any one. The court therefore granted a discharge.

[For subsequent proceedings in this litigation, see Case No. 11,154.]